CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 0 4 2017

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| CARLA A. CLEHM | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:16-CV-00012 |
| | ) | |
| v. | ) | |
| | ) | |
| BAE SYSTEMS ORDNANCE | ) | By: Hon. Michael F. Urbanski |
| SYSTEMS, INC., et al. | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In this employment action, plaintiff Carla A. Clehm alleges that while working as a tub house helper at the Radford Arsenal, she was sexually assaulted by coworker Joshua Linkous and later sexually harassed by other coworkers. She brings four claims against her employer, defendant BAE Systems Ordnance Systems, Inc.: sex discrimination and sexual harassment (Count I) and retaliation (Count III), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and assault and battery under a respondeat superior theory (Count II) and negligent hiring and retention (Count IV), in violation of Virginia common law. Currently pending before the court is defendant BAE Systems Ordnance Systems, Inc.'s motion for summary judgment on all four claims (ECF No. 153).[1] Because there is insufficient evidence from which a jury could find in Clehm's favor on any of these claims, the court will **GRANT** BAE's motion and dismiss this action with prejudice as to defendant BAE.

---

[1] Defendant Joshua Linkous is named in Count II of the second amended complaint but has not moved for summary judgment.

BAE is the federal defense contractor that operates the Radford Army Ammunition Plant ("the Arsenal"), an ammunitions manufacturing facility. Clehm began working at the Arsenal in 2005. Clehm Dep., ECF No. 154-2, at 36. From early 2014 to 2015, Clehm worked as a helper in the tub house within the Nitrocellulose Area. Defendant Joshua Linkous worked as a Nitrocellulose Chief Operator ("NCCO"), known colloquially as a "tub house chief," which is the position ranking above tub house helper but still within the bargaining unit. Id. at 72, 74, 78. Clehm was sexually assaulted by Linkous at work on two occasions, once on May 19, 2014 and again on or about June 5, 2014.[3] Clehm reported the June assault to coworker Steven Brunk, another NCCO and Clehm's superior in the tub house, whom she has referred to as both a "friend" and a "coworker." Clehm Dep., ECF No. 154-2, at 71, 102, 104, 122, 179; Clehm Dep., ECF No. 160-2, at 361-63; Exs. 22, 41, 43 to Clehm Dep., ECF No. 154-12. Clehm also called Group Leader L.A. Woods several times and asked him to not put her on the same shift as Linkous, but she did not explain why or tell Woods anything about either of the incidents. Clehm Dep., ECF No. 154-2, at 104-05. Clehm admits that she did not immediately report either incident involving Linkous to anyone beyond NCCO Brunk, and she did not file reports with Human Resources (HR), the

---

[2] The facts of this case are summarized below and, consistent with the summary judgment standard, are viewed in the light most favorable to Clehm. See Walker v. Mod-U-Kraft Homes, LLC, 775 F.3d 202, 205 n.1 (4th Cir. 2014) (citing FDIC v. Cashion, 720 F.3d 169, 173 (4th Cir. 2013)).

[3] Linkous admitted to these sexual assaults, see Linkous' Statement of Facts, ECF No. 160-7, and on June 30, 2015 pleaded guilty to criminal charges of sexual assault and battery of Clehm and other female coworkers, in the action styled United States v. Joshua Linkous, Case No. 7:15-cr-00016. Linkous was sentenced on October 13, 2015 to 14 years' incarceration.

labor union representing the Arsenal's workers, or any of the other various channels BAE trains its employees to use to report sexual harassment.[4] Id. at 96-97, 102-03, 106-07.

On July 28, 2014, HR Senior Labor Relations Manager Matt Linkous (no relation to defendant Joshua Linkous) was informed that another tub house helper, C.Q., had reported inappropriate conduct by defendant Linkous. C.Q. made the allegation the evening of July 27, 2014 to Group Leader L.A. Woods and Team Leader Brian Sowers; Woods and Sowers then escalated the allegation to Matt Linkous. M. Linkous Dep., ECF No. 154-14, at 15-16; M. Linkous Decl., ECF No. 154-26, at ¶ 20. Matt Linkous, Woods, and Sowers immediately interviewed C.Q. about her allegation, which she confirmed. M. Linkous Dep., ECF No. 154-14, at 16-17; M. Linkous Decl., ECF No. 154-26, at ¶ 21. Matt Linkous informed HR Business Partner Susanna Worrell that C.Q. had made allegations against defendant Joshua Linkous, and the two noted that this was the first time either of them had heard of any inappropriate conduct involving him. M. Linkous Decl., ECF No. 154-26, at ¶¶ 20, 23.

When Joshua Linkous returned to work the following day, on July 29, 2014, BAE security intercepted him and escorted him to Matt Linkous' office to be interviewed. M. Linkous Dep., ECF No. 154-14, at 17; M. Linkous Decl., ECF No. 154-26, at ¶ 24. Defendant Linkous initially denied any wrongdoing, and Matt Linkous asked him to identify any other females with whom he worked recently. Linkous identified Clehm. M. Linkous Dep., ECF No. 154-14, at 18-19; M. Linkous Decl., ECF No. 154-26, at ¶ 26. Before that, Matt Linkous had never heard Clehm's name mentioned in connection with any alleged

---

[4] Clehm, along with all of BAE's employees, had received training on BAE's numerous sexual harassment policies, which provide examples of prohibited conduct and identify the appropriate reporting procedures. Clehm testified at her deposition that she understood and agreed that company policy was to report incidents to an immediate supervisor, a supervisor's manager, any other member of management, HR, a business conduct officer, or the 24/7 toll-free ethics help line. Clehm Dep., ECF No. 154-2, at 36-40, 42-47, 49-63.

misconduct involving Joshua Linkous. M. Linkous Decl., ECF No. 154-26, at ¶ 27. At the conclusion of the interview, defendant Linkous was suspended, instructed to surrender his badge, and escorted off of the premises. BAE issued a "badge stop," which effectively banned Linkous from the Arsenal, and his photograph was held at the security gate to further prevent entry until BAE could conclude its investigation of the allegations against him. Joshua Linkous never stepped foot inside the facility again. M. Linkous Dep., ECF No. 154-14, at 27, 44-45; M. Linkous Decl., ECF No. 154-26, at ¶ 28; Clehm Dep., ECF No. 154-2, at 116.

That same day, Matt Linkous interviewed Kevin Mason and Eldon Meredith, both NCCOs, and asked whether they had information regarding C.Q.'s allegations. Both Mason and Meredith stated that C.Q. had told them about her issues with Linkous but asked them not to report it further, and neither Mason nor Meredith had personally witnessed anything between the two. However, Mason then told Matt Linkous that he had witnessed an interaction between Clehm and defendant Linkous, after which Clehm looked upset, but Mason had not seen anything inappropriate occur. M. Linkous Dep., ECF No. 154-14, at 20; M. Linkous Decl., ECF No. 154-26, at ¶¶ 29-30.

Upon Clehm's return to work on August 2, 2014, Matt Linkous and HR Business Partner Susanna Worrell sought her out and interviewed her. Clehm Dep., ECF No. 154-2, at 105-06, 109, 114. When Clehm was informed that her name had come up in connection with BAE's investigation into Joshua Linkous, her "face dropped and her lip began to shake" and "[a]lmost immediately after she began to cry." Clehm Dep., ECF No. 154-2, at 110, 117-18; M. Linkous Dep., ECF No. 154-14, at 19-20; Worrell Dep., ECF No. 154-18, at

25. Clehm described both the May and June 2014 incidents, and stated no one had witnessed either. Clehm had only disclosed the encounters to NCCO Brunk, her daughter, and her roommate. Clehm Dep., ECF No. 154-2, at 185; M. Linkous Decl., ECF No. 154-26, at ¶ 34. Clehm explained that she did not report her confrontations with defendant Linkous to anybody else, "[b]ecause I know what he can do." Clehm Dep., ECF No. 154-2, at 120, 130. Clehm stated that she was afraid of Joshua Linkous, fearing that he would come after her and try to kill her. Id. at 118.

Matt Linkous, on behalf of HR, continued meeting with potential witnesses on August 5, 2014. He determined that defendant Linkous should be discharged for this conduct, but kept him suspended with a badge stop while HR continued its investigation, due to the likelihood that the union would file a grievance in response. M. Linkous Decl., ECF No. 154-26, at ¶ 36. Further interviews revealed others were victimized by defendant Linkous. For instance, on August 6, 2014, HR met with G.O., who stated that she had been groped by defendant Linkous four or five years earlier but did not report it. The next day, HR met with L.P. who was similarly assaulted by defendant Linkous a year prior but was too ashamed to report it, and no one had witnessed the incident. M. Linkous Decl., ECF No. 154-26, at ¶¶ 38-39.

At HR's request, Clehm, C.Q., G.O., and NCCOs Brunk, Mason, and Meredith all submitted handwritten statements on August 8, 2014. Id. at ¶ 41. That same day, Clehm informed Matt Linkous that she had a Protective Order issued against defendant Linkous on August 7, 2014. Id. at ¶ 42; Clehm Dep., ECF No. 154-2, at 232. On August 14, 2014, HR completed its investigation and notified defendant Linkous that his employment was

terminated effective immediately. M. Linkous Decl., ECF No. 154-26, at ¶¶ 42, 47. HR also notified Clehm and the other victims that Linkous had been discharged and the investigation had concluded. Id. at ¶ 47.

## A.

In the aftermath of these events, Clehm suffered from various health issues including migraines, inability to focus, debilitating headaches, depression, anxiety, and panic attacks. Clehm began seeking medical treatment for her stress at work and, on August 5, 2014, while BAE's investigation was still ongoing, reported to her primary care doctor that she had been sexually assaulted. Clehm Dep., ECF No. 154-2, at 156. She later began seeking counseling from a licensed clinical social worker, as well as from BAE's Employee Assistance Program. On October 27, 2014, Clehm took FMLA leave. M. Linkous Decl., ECF No. 154-26, at ¶ 49. While on leave, BAE approved Clehm for short term disability benefits pursuant to company policy. Clehm testified at her deposition that "time off work [had] helped a lot, just not being in the place takes a little pain away." Clehm Dep., ECF No. 154-2, at 295-96.

On January 12, 2015, Clehm attempted to pick up her medication and was unable to do so because she no longer had insurance coverage. Clehm insists no notice was sent to her explaining why her coverage had been cancelled. Soon thereafter, however, Clehm learned that her insurance coverage had been cancelled due to non-payment of premiums. Clehm Dep., ECF No. 154-2, at 291, 296. Clehm later had these benefits reinstated with assistance from HR. Id. at 296, 325. Approximately two months later, Clehm received a letter from BAE dated March 7, 2015, stating Clehm had exhausted her FMLA leave and supplemental family and medical leave according to BAE policy. Id. at 314. Clehm appealed this decision

and obtained additional documentation from her healthcare providers, pursuant to which her leave was extended through April 26, 2015.

Still not ready to return to work, Clehm had a conversation with HR Director Amanda Burns on May 13, 2015, which was memorialized in an email dated May 19, 2015. Burns explained to Clehm how to appeal the cancellation of her medical benefits and stated the company would "continue to do everything in [its] power to assure that [Clehm] ha[s] the coverage to which [she is] entitled." Ex. 85 to Clehm Dep., ECF No. 154-13. Burns noted that Clehm had said she did not want to return to work yet but felt she had to because she had exhausted her FMLA leave and feared she would lose her job. Burns addressed Clehm's concern, stating: "I told you and am reaffirming in this letter that your job is not in jeopardy and that we would absolutely grant you additional leave as a necessary accommodation for your current needs." Id. To that end, Burns offered Clehm an additional unpaid leave of absence, which Clehm accepted. Burns stated that she would contact Clehm at the end of each month to assess whether Clehm was ready to return to work and determine what measures might be taken by BAE to make Clehm feel comfortable returning to work. If Clehm continued to feel like she could not return to work, her unpaid leave would be extended another month. Id.; see also Clehm Dep., ECF No. 154-2, at 334. Burns reiterated that BAE was willing to do whatever was necessary to facilitate Clehm's return to work and make her feel comfortable—altering her schedule to minimize interaction with coworkers, escorting her to and from her car, and entertaining any reasonable suggestion Clehm might have along these lines. Ex. 85 to Clehm Dep., ECF No. 154-13; Clehm Dep., ECF No. 154-2, at 335. Burns also stated BAE would pay Clehm for 95 hours she had in the

vacation leave bank as well as for 36 hours that she had been scheduled to work, but could not work, that past weekend, "as a sign of good faith." Ex. 85 to Clehm Dep., ECF No. 154-13; Clehm Dep., ECF No. 154-2, at 332-34. Clehm testified she was appreciative of the leave extensions and the efforts to facilitate her return to work. Clehm Dep., ECF No. 154-2, at 340, 342; Ex. 86 to Clehm Dep., ECF No. 154-13.

### B.

Following her return to work in September 2015, Clehm Dep., ECF No. 154-2, at 348, Clehm reported several incidents involving coworkers that she found offensive and made her uncomfortable. Clehm reported to supervisor Rusty Quesenberry on February 24, 2016, that co-worker William Barton had been "goosing" her by going up behind her to grab and startle her. Clehm was particularly affected by the "goosing" because Barton was grabbing the same upper-arm and shoulder area that Linkous had grabbed during the second assault, and it gave her nightmares. Id. at 356-59. Clehm also told Quesenberry that Robert Kennett, a NCCO and a friend of Clehm's, told her during a shift "that he wanted [her] legs on his shoulders so he could give [her] a fuzzy mustache ride...[a]pparently referring to oral sex[.]" Id. at 364. Clehm said he was "being nasty" – calling her names like "hey sexy," and stating he could "satisfy" her better than her boyfriend. Id. at 365.

Clehm had told her friend, NCCO Steven Brunk, about the situation the previous day, and was visibly upset when recounting the story to Quesenberry. She begged Quesenberry not to tell anyone because she wanted to be left alone, as there was "so much attention with the Josh Linkous case" and she feared it would cause her more trouble at work. Id. at 359, 366, 370; see Ex. 103 to Clehm Dep., ECF No. 154-13. At Quesenberry's

urging, Clehm met with L.A. Woods, and later with Matt Linkous, about the incidents. Id. at 371, 373; Ex. 104 & 105 to Clehm Dep., ECF No. 154-13. Woods asked Clehm if she felt comfortable back in the tub house, and she responded affirmatively, stating she "trusted the guys on that shift." Clehm Dep., ECF No. 154-2, at 371; see also id. at 374; Ex. 104 to Clehm Dep., ECF No. 154-13. Woods offered to move Clehm out of the tub house, but she declined because she "didn't want to be around strange men," and she "just wanted to come to work, do [her] job and get home alive." Clehm Dep., ECF No. 154-2, at 372; Ex. 104 to Clehm Dep., ECF No. 154-13. Clehm told Woods that she was okay and then returned to her shift. Clehm Dep., ECF No. 154-2, at 372; Ex. 104 to Clehm Dep., ECF No. 154-13.

Both Barton and Kennett were disciplined for these incidents, each receiving a three-day suspension for "inappropriate conduct." Clehm Dep., ECF No. 154-2, at 374-77, 383; Ex. 106 & 107 to Clehm Dep., ECF No. 154-13. The union filed grievances over these suspensions, asking that they be overturned and/or that Barton and Kennett be paid for the three days and further demanding that BAE stop creating a hostile work environment. Ex. 106 & 107 to Clehm Dep., ECF No. 154-13. BAE opposed the grievances. See Clehm Dep., ECF No. 154-2, at 377-383; Ex. 106 & 107 to Clehm Dep., ECF No. 154-13.

Rumors circulated that there was a "petition" going around, signed by employees who felt uncomfortable working with Clehm. See M. Linkous Decl., ECF No. 154-26, at ¶ 54; Ex. 106 & 107 to Clehm Dep., ECF No. 154-13; Sowers Dep., ECF No. 154-21, at 27-28, 31; M. Linkous Dep., ECF No. 154-14, at 47; Clehm Dep., ECF No. 154-2, at 378-79. Matt Linkous testified that his investigation revealed there was not a petition per se, but rather a list of employee signatures on a page entitled "For Hostile Work Environment"

attached to the grievances filed in connection with the Barton and Kennett suspensions. M. Linkous Dep., ECF No. 154-14, at 47; Ex. 106 & 107 to Clehm Dep., ECF No. 154-13. Matt Linkous told the union president that to the extent there was such a petition, "it stopped immediately." M. Linkous Dep., ECF No. 154-14, at 47; see also Sowers Dep., ECF No. 154-21, at 28. One employee, Connie Clark, whose name appears on the "For Hostile Work Environment" list of names, approached Clehm and asked her "how she felt about putting a man in prison and taking him away from his family." M. Linkous Decl., ECF No. 154-26, at ¶ 55; M. Linkous Dep., ECF No. 154-14, at 47-48. Following BAE's investigation into this incident, Clark also received a three-day suspension. The union again filed a grievance, which BAE opposed. M. Linkous Decl., ECF No. 154-26, at ¶ 55.

Clehm continued to struggle with fear, intrusive thoughts and difficulty sleeping, and on March 28, 2016, she went out on short term disability leave with BAE's approval. Ex. 118 to Clehm Dep., ECF No. 154-13; Clehm Dep., ECF No. 154-2, at 388, 400. During that time, she maintained fairly regular contact with Matt Linkous regarding her employment status. Clehm Dep., ECF No. 154-2, at 400. By letter dated June 27, 2016, Matt Linkous advised Clehm that because she had no remaining FMLA or other leave, part of her time off in March had been treated in accordance with the collective bargaining agreement, resulting in points being automatically applied to Clehm's employment record. Id. at 401; Ex. 119 to Clehm Dep., ECF No. 154-13. He informed Clehm that BAE was taking care of this by removing any disciplinary action associated with her March leave and resetting her point total to zero. Clehm Dep., ECF No. 154-2, at 401-02; Ex. 119 to Clehm Dep., ECF No. 154-13. Clehm requested extension of her leave three times, all of which were granted. See

Ex. 120 to Clehm Dep., ECF No. 154-13. By letter dated July 20, 2016, Matt Linkous

confirmed that Clehm would continue to receive short term disability leave through August

15, 2016. Id. He asked Clehm to contact him after her next doctor's appointment to make

arrangements for extending her leave further or returning to work, to which end he assured

her: "we will work closely with you to ensure that your return to work is met with a safe and

productive working environment. . . . We wish you the best and look forward to your return

when you are ready and able to do so." Id.

Clehm prepared to return to work on a part time basis as of September 19, 2016,

requesting she return to the same work location but only work night shift for a few weeks.

Matt Linkous confirmed BAE's willingness to accommodate that request by letter dated

September 19, 2016. Clehm Dep., ECF No. 154-2, at 406; Ex. 125 to Clehm Dep., ECF No.

154-13. Matt Linkous further stated that BAE would continue to work with her to make her

transition back to work comfortable and pledged BAE would not tolerate any conduct

inconsistent with that goal. Ex. 125 to Clehm Dep., ECF No. 154-13.

Clehm returned to work as scheduled and on her first night in the tub house, she

"had trouble" with the fill-in helper, Paul Russell. Clehm Dep., ECF No. 154-2, at 412, 414.

Clehm testified that Russell was angry with her for returning to work and stated: "Wonder

where the f*** I'm going to have to work now that you're back." Clehm Dep., ECF No.

154-2, at 412. Clehm reported the incident to supervisor Rusty Quesenberry, as well as to

Matt Linkous and L.A. Woods. Id. at 412-13. Russell was given a verbal warning. M. Linkous

Decl., ECF No. 154-26, at ¶ 59. Subsequently, Clehm went back out on leave and sought an

extension of that leave through at least November 21, 2016, which BAE again granted. See

Ex. 126 to Clehm Dep., ECF No. 154-13. By letter dated October 25, 2016, Matt Linkous continued to express his willingness to facilitate Clehm's return to work in a safe and productive environment. Id. As of the summary judgment filing, Clehm worked as a lab truck driver for BAE. M. Linkous Decl., ECF No. 154-26, at ¶ 64.

Clehm filed her first charge of discrimination on March 4, 2015, received a right to sue letter, and timely filed the instant action. Clehm later supplemented that first charge of discrimination to include the incidents involving Barton and Kennett and received a second right to sue letter dated July 26, 2016.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with…[any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and may prevail by showing "an absence of evidence to support" an essential element of the nonmoving party's case.

Celotex, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward with specific material facts that prove there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Although "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor,'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment. Anderson, 477 U.S. at 252. Rather, a genuine issue of material fact exists only "if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

### III.

The court turns first to Clehm's hostile work environment claim. Sexual harassment that creates a hostile or abusive environment in the workplace may give rise to a claim of sex discrimination under Title VII. Meritor Savings Bank v. Vinson, 477 U.S. 57, 66 (1986). A

hostile work environment is one that is "permeated with 'discriminatory intimidation, ridicule, and insult,' [and] that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations omitted). "However, Title VII does not 'attempt to purge the workplace of vulgarity' and '[n]ot all sexual harassment that is directed at an individual because of his or her sex is actionable.'" Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 207 (4th Cir. 2014) (quoting Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996)). For example, "[a]ctivities like simple teasing, offhand comments, and off-color jokes, while often regrettable, do not cross the line into actionable misconduct." EEOC v. Fairbrook Medical Clinic, P.A., 609 F.3d 320, 328 (4th Cir. 2010) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

To survive summary judgment on a hostile work environment claim, Clehm must produce evidence sufficient for a reasonable juror to conclude (1) that the conduct in question was unwelcome, (2) that the harassment was based on her gender, (3) that the harassment was sufficiently pervasive or severe to alter the conditions of her employment and create an abusive work environment, and (4) that some basis exists for imputing liability to her employer. EEOC v. Xerxes Corp., 639 F.3d 658, 668-69 (4th Cir. 2011); EEOC v. Central Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009) (citing EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 313-14 (4th Cir. 2008)). The court finds, for purposes of summary judgment, that Clehm can meet the first three elements of her hostile work

environment claim.[5] The issue in this case is whether there is any basis for imputing liability to BAE, and that is where the court will focus its analysis.

## A.

An employer's liability for workplace harassment depends upon the status of the harasser. Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013). If the harasser is the victim's supervisor, the employer may be vicariously liable to a victimized employee for a hostile work environment created by a supervisor.[6] Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). However, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Vance, 133 S. Ct. at 2439. "[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it." Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333-34 (4th Cir. 2003) (citing Spicer v. Commonwealth of Va. Dep't of Corr., 66 F.3d 705, 710 (4th Cir. 1995); Ellerth, 524 U.S. at 759). As the Fourth Circuit has recognized, "the law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Barrett v. Applied Radiant Energy

---

[5] The assaults by Joshua Linkous and incidents involving Barton and Kennett were plainly unwelcome, see Briggs v. Waters, 484 F. Supp. 2d 466, 478 (E.D. Va. 2007) (citing Lewis v. Forest Pharm., Inc., 217 F. Supp. 2d 638, 647 (D. Md. 2002)), and occurred because of Clehm's gender, see Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996) (citing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Fuller v. Phipps, 67 F.3d 1137, 1144 (4th Cir. 1995)). The third element – whether the harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment— has both subjective and objective components. See Walker, 775 F.3d at 208 (quoting Central Wholesalers, 573 F.3d at 175). The court holds that the conduct complained of in this case meets the severe or pervasive requirement. Clehm perceived, and a reasonable person in Clehm's position would perceive, the work environment to be abusive or hostile within the meaning of Title VII, given the totality of the circumstances and drawing all reasonable inferences in Clehm's favor. Id.; see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998); Harris, 510 U.S. at 23; Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015).

[6] "If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided." Vance, 133 S. Ct. at 2439.

Corp., 240 F.3d 262, 268 (4th Cir. 2001) (quoting Shaw v. AutoZone, Inc., 180 F.3d 806, 813 (7th Cir. 1999)). "An employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer." Id. (citing Lissau Southern Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1998)).

Thus, "it matters whether a harasser is a 'supervisor' or simply a co-worker," Vance, 133 S. Ct. at 2439, and in this case, the parties dispute whether the alleged harassers were supervisors within the meaning of Title VII. The United States Supreme Court has recognized there is a "clear distinction between supervisors and co-workers," and "supervisory status can usually be readily determined." Id. at 2443 (citing Ellerth, 524 U.S. at 761, and Faragher, 524 U.S. 775). In Vance, the Court held for purposes of vicarious liability under Title VII that an employee is a "supervisor" "if he or she is empowered by the employer to take tangible employment actions against the victim." Id. at 2454.

While Clehm's harassers may have ranked above her as tub house "chiefs," it matters not whether Clehm regarded them as supervisors—they are not supervisors within the meaning of Title VII. The NCCO position is a non-managerial, hourly production role devoid of typical supervisory functions. See M. Linkous Decl., ECF No. 154-26, at ¶ 16; Brunk Decl., ECF No. 154-32, at ¶¶ 3-4; Woods Decl., ECF No. 154-33, at ¶¶ 2-3. Clehm has not established that either Joshua Linkous or Kennett as NCCOs[7] directed her day-to-day activities or had the authority to significantly change her employment status or its terms and conditions. See M. Linkous Decl., ECF No. 154-26, at ¶ 16; Brunk Decl., ECF No. 154-

---

[7] Barton was not an NCCO but another bargaining unit member doing some painting in her building. See Clehm Dep., ECF No. 160-2, at 364; M. Linkous Decl., ECF No. 154-26, at ¶ 52.

32, at ¶¶ 3-4; Woods Decl., ECF No. 154-33, at ¶¶ 2-3; Clehm Dep., ECF No. 154-2, at 137-38. Thus, Joshua Linkous, Barton and Kennett are all properly characterized as coworkers for purposes of this analysis.

## B.

BAE's liability therefore depends upon what it knew or should have known, and whether it responded with appropriate remedial action. An employer "may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." Ocheltree, 335 F.3d at 334; see also Vance, 133 S. Ct. at 2453 ("Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant."). If such procedures exist, however, "'an employer *cannot* be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists' under its reasonable procedures." Xerxes Corp., 639 F.3d at 674 (quoting Howard v. Winter, 446 F.3d 559, 567 (4th Cir. 2009)) (emphasis added by Fourth Circuit in Xerxes). Indeed, an employee claiming coworker harassment "bears significant responsibility in notifying the employer," and cannot "impute liability on the employer under a theory that the employer must exercise an all-seeing omnipresence over the workplace." Howard, 446 F.3d at 567, 570. "Little can be done to correct this objectionable behavior unless the victim first blows the whistle on it." Barrett, 240 F.3d at 268.

Plainly, Clehm did not take advantage of BAE's harassment reporting procedures, of which she was well aware, with respect to the assaults by Joshua Linkous. See generally

17

Clehm Dep., ECF No. 160-2, at 36-63. Clehm did not affirmatively report the assaults to a supervisor, member of management, HR, or through the 24/7 ethics help line. See id. at 96-97, 102-07. In fact, the first suggestion that there may have been an issue of concern between defendant Linkous and Clehm came from Joshua Linkous himself in the course of the investigation of C.Q.'s claims of harassment. See M. Linkous Decl., ECF No. 154-26, at ¶¶ 26-27; see also Clehm Dep., ECF No. 154-2, at 106-07. Clehm claims to have put BAE on notice of the assaults when she told NCCO Brunk, "the person that was in charge of [her]," a week or two after the June incident. Clehm Dep., ECF No. 154-2, at 102, 104. As discussed previously, however, a NCCO is a member of the bargaining unit and not a "supervisor" within the meaning of Title VII. See Vance, 133 S. Ct. at 2454. In any event, Brunk gave no indication that he would escalate Clehm's complaint to management, and she could not have expected him to do so. Rather, as Clehm testified, Brunk told her that she needed to report the harassment "right away." Clehm Dep., ECF No. 154-2, at 102-04. The fact that Clehm was afraid to tell management does not excuse her from taking advantage of BAE's established procedures. "Allowing subjective fears to vitiate an employee's reporting requirement would completely undermine Title VII's basic policy 'of encouraging forethought by employers and saving action by objecting employees.'" Barrett, 240 F.3d at 268.

Clehm also claims BAE was put on notice when she asked Group Leader L.A. Woods to be transferred to a different shift. But Clehm admitted in her deposition that she did not tell Woods anything about the assaults when she made this request. Rather, she "just told him there was some trouble between Josh [Linkous] and [her] and [she] did not want to

work on his shift." Clehm Dep., ECF No. 154-2, at 105. Clearly this did not put BAE on notice of sexual harassment.

Equally unavailing is Clehm's argument that the 24/7 ethics hotline was useless. "An employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer." Barrett, 240 F.3d at 268 (citing Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1998)).

Clehm further asserts that BAE must have known about the harassment because defendant Linkous had assaulted other female employees before Clehm, and coworkers had interrupted or had been told about these previous assaults by the victims. Even so, this is insufficient to establish BAE was on notice of the harassment claimed in the instant case. There is no evidence that any coworker's knowledge of any of Joshua Linkous' assaults ever filtered up to management, and it is undisputed that Clehm never told management herself about his harassing behavior. Cf. Barrett, 240 F.3d at 267 (affirming judgment for defendant on Title VII claim where plaintiff asserted company must have known about harassment because she had told so many of her co-workers but offered no evidence that those conversations filtered up to management or that she told management herself). On these facts, the court cannot find that BAE had notice—actual or constructive—of the assaults involving Joshua Linkous prior to the investigation of C.Q.'s complaints.

BAE's swift response to C.Q.'s allegations lends further support for the fact that it previously had not been made aware of Joshua Linkous' inappropriate behavior towards Clehm or anyone else, and demonstrates that BAE's reporting policies are reasonably

effective. Within one day of HR receiving notification of C.Q.'s allegations against defendant Linkous, he was intercepted by security, interviewed by HR, suspended, instructed to surrender his badge, and escorted off of the premises, never to return again. More still, BAE issued a "badge stop," which effectively banned Joshua Linkous from the facility, and his photograph was held at the security gate to further prevent entry until BAE could conclude its investigation. Once the investigation ended, he was terminated.[8] BAE's remedial action was reasonably calculated to correct and end Linkous's harassing behavior. Xerxes Corp., 639 F.3d at 669.

The fact that Clehm subsequently suffered harassment at the hands of Barton and Kennett is unfortunate but does not serve as evidence that BAE's response to the Linkous complaints was inadequate. "'Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist,' or, as in this case, harassment reoccurs in the workplace." Xerxes Corp., 639 F.3d at 669-70 (quoting Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 676 (10th Cir. 1998)). There is no particular combination of remedial measures that must be employed for a company to insulate itself from liability. Id. at 669 (quoting EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 178 (4th Cir. 2009)). Responses held reasonable often include "'prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral and written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination.'" Id. at 669 (quoting Adler, 144 F.3d at 676-77). "[T]he mere fact that

---

[8] It should also be noted that Joshua Linkous was subsequently arrested, criminally charged, and sentenced to 14 years' incarceration.

harassment reoccurs in the workplace, either by the same offender or different offenders, does not, *ipso facto*, allow a jury to conclude that an employer's response was not reasonably calculated to end the harassment." Xerxes Corp., 639 F.3d at 669 (citing Adler, 144 F.3d at 676). Moreover, "where an employer's response to reported harassment is handled in accordance with the company's established policy and includes conducting an investigation and taking action to address the findings in a prompt manner, such conduct is 'reasonably calculated to end the harassment and, therefore, reasonable as a matter of law.'" Lorenz v. Fed. Express Corp., Case No. 7:10-cv-00487, 2012 WL 4459570, at *8 (W.D. Va. Aug. 17, 2012) (quoting Xerxes, 639 F.3d at 671).

Indeed, once Clehm reported the harassment by Barton and Kennett through the appropriate channels, BAE launched an immediate investigation, conducted interviews, suspended both employees without pay, and opposed the grievances later filed by the union on Barton's and Kennett's behalf.[9] This remedial action was likewise reasonably calculated to end the harassment. As such, BAE cannot be held liable for any of the harassment alleged in this case. See Xerxes, 639 F.3d at 670 ("'[A]n employer is not liable, although [harassment] persists, so long as each response was reasonable.'" (quoting Adler, 144 F.3d at 676-77)). Summary judgment will be granted in defendant's favor as to Count I.

## IV.

Clehm also claims BAE unlawfully retaliated against her for engaging in protected activity. Title VII prohibits employers from retaliating against an employee because of that employee's participation in a protected activity, including opposition to, or complaints about,

---

[9] L.A. Woods also offered to move Clehm out of the tub house but she declined.

an unlawful employment practice. 42 U.S.C. § 2000e-3(a); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996). To establish a prima facie case of retaliation, Clehm must prove: (1) that she engaged in protected activity; (2) that a materially adverse employment action was taken against her; and (3) that there was a causal link between the protected activity and the adverse employment action. Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010); Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). There is no dispute that Clehm engaged in protected activity. See generally White, 548 U.S. at 59; Laughlin, 149 F.3d at 259. Because Clehm has not suffered a materially adverse employment action, however, her retaliation claim fails as a matter of law.

"To prevail on a Title VII [retaliation] claim, 'the existence of some adverse employment action is required.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (quoting James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004)). "An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" Id. Clehm must prove that "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" White, 548 U.S. at 68 (quoting Rochon v. Gonzalez, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Indeed, "[t]here must be some significant detrimental effect," such as a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." Holland, 487 F.3d at 219. Title VII is not a "general civility code for the American workplace," Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998),

and it does not immunize an employee from "those petty slights or minor annoyances that often take place at work and that all employees experience." White, 548 U.S. at 68. In that respect, "it is important to separate significant from trivial harms." Id.

Clehm insists she suffered a constructive discharge, evidenced by her extended, medically-necessary leave of absence. Clehm is still works for BAE, however, and has never resigned her employment. "[A]n employee cannot bring a constructive-discharge claim until [s]he is constructively *discharged*"—that is, Clehm must have actually resigned. Green v. Brennan, 136 S. Ct. 1769, 1777 (2016) (emphasis in original). There has been no constructive discharge in this case.

As evidence of a materially adverse employment action, Clehm points to the fact that BAE cancelled her health insurance and assessed attendance points on her employment record during a leave of absence. Both of these situations, once discovered, were corrected by BAE. Clehm's health insurance had been cancelled because she failed to pay the premiums while on leave, and BAE assisted her in reinstating her benefits. And the points on Clehm's record, assessed automatically according to the terms of the collective bargaining agreement during one of her periods of leave, were removed, her point total was reset to zero, and no disciplinary action was taken against her as a result. At the end of the day, Clehm suffered no adverse employment consequences as a result of these two occurrences.

The remaining evidence Clehm relies on in support of her retaliation claim amounts to nothing more trivial harm and does not constitute a materially adverse employment action under Title VII. White, 548 U.S. at 68. Clehm claims that her coworkers made ostracizing comments and circulated a petition with a list of names of people who did not want to work

with her. This kind of "snubbing" is not actionable under Title VII. <u>White</u>, 548 U.S. at 68

(citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.

1996)). Moreover, BAE promptly investigated and responded to Clehm's complaints about

comments made by coworkers as well as the "petition." Connie Clark, who asked Clehm

"how she felt about putting a man in prison and taking him away from his family," was given

a three-day suspension, and Paul Russell who asked generally, "wonder where the f*** I'm

going to have to work now that you're back," was given a verbal warning. These type of

comments fall into the category of "petty slights, minor annoyances, and simple lack of good

manners," which are insufficient to establish the second element of a Title VII retaliation

claim. <u>Id.</u>

BAE granted every leave of absence requested by Clehm, afforded her short term

disability benefits, kept her job open, and otherwise accommodated her needs, expressing its

ongoing willingness to facilitate her return to work, whenever and in whatever capacity she

wanted to come back. It swiftly responded to her complaints of ostracizing comments made

by coworkers. There is no evidence of any action taken by BAE that had a "significant

detrimental effect" of Clehm's employment. <u>Holland</u>, 487 F.3d at 219. As such, Clehm's

retaliation claim fails as a matter of law.

## V.

Clehm also raises two Virginia common law claims in her second amended

complaint, neither of which survive summary judgment.

## A.

Count II alleges assault and battery against BAE under a respondeat superior theory,[10] claiming Joshua Linkous assaulted Clehm while "making his rounds and performing his managerial duties" as a NCCO. Second Am. Comp, ECF No. 59, at ¶¶ 10, 11, 16. The mere fact that the assaults occurred on the BAE premises during working hours is not enough to impose respondeat superior liability on BAE, however. Jones v. Tyson Foods, Inc., 378 F. Supp. 2d 705, 713 (E.D. Va. 2004) (citing Cary v. Hotel Rueger, Inc., 195 Va. 980, 81 S.E.2d 421 (1954)), aff'd, 126 F. App'x 106 (4th Cir. 2005). Under Virginia law, "an employer is liable [under the doctrine of respondeat superior] for the tortious acts of its employee if the employee was performing his employer's business and acting within the scope of his employment when the tortious acts were committed." Plummer v. Ctr. Psychiatrists, Ltd., 252 Va. 233, 235, 476 S.E.2d 172, 173 (Va. 1996) (holding that respondeat superior liability could lie where a psychologist engaged in sexual relations with a patient while providing therapy and counseling services, the services for which he was employed). If the plaintiff shows that an employment relationship exists, the employer bears the burden of proving that its employee was not acting within the scope of his employment when he committed the tortious act. Henderson v. White's Truck Stop, Inc., No. 6:08-CV-00042, 2011 WL 1627120, at *7 (W.D. Va. April 29, 2011) (citing Gina Chin & Assocs., Inc. v. First Union Bank, 260 Va. 533, 542, 537 S.E.2d 573, 577 (Va. 2000)). "'The relevant test to determine whether particular conduct is within the scope of employment is 'whether the service itself, in which the tortious act was done, was within the ordinary course of the

---

[10] The court previously dismissed this claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure but granted Clehm's motion to file a second amended complaint, in which she realleged Count II and added factual allegations to support the claim. See ECF No. 58, 59.

employer's business.'" Id. (quoting Blair v. Defender Servs., Inc., 386 F.3d 623, 627 (4th Cir. 2004)); see also Jones, 378 F. Supp. 2d at 713. An employer can be held vicariously liable for an employee's tortious act if he "engaged in the conduct as he 'executed the service for which he was engaged.'" Id. (quoting Plummer, 252 Va. at 237, 476 S.E.2d at 174) (alterations omitted). Summary judgment is appropriate when the conduct consists of either a slight deviation or a marked and unusual departure from the employer's business; anything in between presents for the jury a question of fact as to whether the employee acted within the scope of employment. Rivett Group, LLC v. Chelda, Inc., 657 F. Supp. 2d 732, 737 (W.D. Va. 2009) (citing Gina Chin, 260 Va. at 542, 537 S.E.2d at 578).

In this case, Clehm alleges that Linkous was "making his rounds and performing his managerial duties" during both of the times he assaulted her, insisting his conduct was thus within the scope of his employment duties. Second Am. Compl., ECF No. 59, at ¶¶ 11, 16. But Clehm's own testimony establishes that Joshua Linkous' conduct consisted of a marked and unusual departure from his employment with BAE as a NCCO. She describes the first incident in May, 2014 as follows:

> Okay. So he wanted to talk to me about what happened to his wife and I told him that I didn't want to speak to him. I was trying to exit the building and he grabbed me by the back pocket of my coveralls and pulled me back into the building and told me that I was going to speak to him about his wife . . . [and whether] she's having sex with people in here.[ ]
> And that's when he asked me if I wanted to have sex with him to get back [at] her.

Clehm Dep., ECF No. 160-2, at 93-94. As for the June, 2014 incident, Clehm explained:

> I was returning to the Tub House, to my locker. His shift was working. Joshua Linkous's shift was working. He walked behind me as I was putting my stuff in my locker to leave for

the end of my shift. I did not see where he went. So I was trying
to exit the building a different way than the way that I seen him
go.

So as I was getting ready to exit the building to go down
the steps, he grabs me and pulls me in the control room, which
is in a corner of the building, and he shoves me in the control
room and turns the light out, shuts the door, locks the door,
slams me up against the way, and he tells me that he is going to
have sex with me. And he [proceeds to assault her].

Id. at 100.

Clehm asserts that defendant Linkous was "performing his managerial functions as

tub house chief" at the time of these assaults. See Pl.'s Opp. Br., ECF No. 160, at 6. The fact

that his job was that of a tub house "chief" and that he was present at work in the tub house

on the dates in question, without more, does not establish that he was engaged in his

workplace duties or functions at the time of the assaults. See Jones, 378 F. Supp. 2d at 713.

Clehm argues on brief that "walking the buildings and speaking with her was indisputably

part of his job duties." Pl.'s Opp. Br., ECF No. 160, at 27. However, as Clehm testified, both

of the assaults occurred while she was in the process of *exiting the building* – not while

Linkous encountered Clehm as he was performing some tub house-related task or other

requirement of his job as NCCO.[11] Indeed, when asked to explain how he was "performing

his managerial duties" on the days he assaulted her, Clehm testified only that he "was

running his building . . . He was managing his building" at the time. Clehm Dep., ECF No.

---

[11] Kevin Mason's description of what he witnessed in May, 2014 confirms the incident did not take place while
defendant Linkous was engaging in workplace duties. Mason testified that just before the incident occurred, he and
Linkous had been sitting in the break room around lunchtime when Clehm came in to retrieve something out of her
locker and, "as she was about to leave, [Linkous] told me that he had to – he told me he would be right back, he had to
ask her something, which I thought nothing of. And I guess approximately ten, 15 minutes later, he still hadn't
returned." Mason got up, walked through the building, happened upon Linkous and Clehm and saw that she was crying,
and, not knowing what he had encountered, turned and walked off. When he and Linkous were back in the break room,
he asked Linkous what was going on, and Linkous replied "oh, that was nothing. He said, I was just finding out some
information." Mason Dep., ECF No. 160-10, at 29-30.

160-2, at 440-41, 444. The court declines to hold BAE strictly liable for these two assaults simply because they occurred during work hours in the tub house.

This case is unlike Heckenlaible v. Virginia Peninsula Regional Jail Authority, 491 F. Supp. 2d 544 (E.D. Va. 2007), on which Clehm relies. In Heckenlaible, the court found a question for the jury as to whether a correctional officer at a prison was acting within the scope of his employment when he used the authority of his office to announce to an inmate that he was entering her cell to conduct a search. The court reasoned:

> [T]his was not a case where a wrongful act occurred in the workplace merely because an employee was in a particular location at a particular time as a result of his employment. Steele's duties as a correctional officer required him to observe inmates in the shower, and the alleged sexual assault occurred after he observed Heckenlaible showering and during a "cell search" thereafter. Steele's impulse to have sexual contact with Heckenlaible may well have arisen, at least in part, from the fact that he was required to view Heckenlaible while she was unclothed in the shower. In light of these circumstances, a reasonable juror could conclude that the alleged sexual assault arose out of Steele's performance of his duties.

491 F. Supp. 2d at 551. The same cannot be said in the instant case. There is no evidence that Linkous' encounters with Clehm in May and June, 2014, were naturally incident to his job as NCCO, or that these acts were "performed . . . with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business." Id. at 549 (quoting Virginia's definition of "scope of employment" as set forth in Kensington Assocs. v. West, 234 Va. 430, 432, 362 S.E.2d 900, 901 (1987)). Rather, these acts arose "'from some external, independent, and personal motive on the part of [Linkous] to do the act upon his own account.'" Id. (quoting Kensington Assocs., 234 Va. at 432, 362 S.E.2d at 901). Because Linkous' conduct

represents a "marked and unusual departure" from BAE's business, the court grants summary judgment in defendant's favor on Count II.

## B.

Count IV, alleging negligent hiring and retention against BAE, suffers a similar fate. Clehm claims BAE knew or should have known that Joshua Linkous posed a risk to female employees because of his propensity to sexually harass women. In Virginia, the tort of negligent hiring "is based on the principle that one who conducts an activity through employees is subject to liability for harm resulting from the employer's conduct if the employer is negligent in the hiring of an improper person in work involving an unreasonable risk of harm to others." S.E. Apartments Mgmt., Inc. v. Jackman, 257 Va. 256, 260, 513 S.E.2d 395, 397 (1999). Similarly, an employer "is subject to liability of harm resulting from the employer's negligence in retaining a dangerous employee who the employer knew or should have known was dangerous and likely to harm others." Id. at 261, 513 S.E.2d at 397. "Courts applying Virginia law have recognized that an employer can negligently retain a sexual harasser." Glover v. Oppleman, 178 F. Supp. 2d 622, 643 (W.D. Va. 2001) (citing Call v. Shaw Jewelers, No. 3:98CV449, 1999 U.S. Dist. LEXIS 636, at *4-5 (E.D. Va. Jan. 7, 1999), aff'd 2001 WL 429710 (4th Cir. Apr. 21, 2000)).

There is no evidence in this case that BAE had actual or constructive knowledge of Joshua Linkous' misconduct prior C.Q.'s complaint on July 28, 2014, as previously discussed. After C.Q. complained, BAE immediately launched an investigation and barred Linkous from the facility the following day, ultimately terminating his employment at the conclusion of its investigation. Clehm claims BAE should have known that Linkous had

"discoverable propensities to sexually assault and batter women," Second Am. Compl., ECF No. 59, at ¶ 61, based on a twenty-year old criminal charge and conversations about that charge amongst BAE employees. Even crediting Clehm's argument that Kevin Mason and Eldon Meredith, both NCCOs, knew about Linkous' prior criminal charge, Clehm offers no evidence that this knowledge—or any knowledge about Linkous' harassing behavior— ever filtered up to management. See Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 267, 269 (4th Cir. 2001). Moreover, Linkous cleared the criminal background check conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives on all personnel at the Arsenal in connection with its Federal Explosives License. Ex. 1 to Armstrong Decl., ECF No. 154-36; M. Linkous Decl., ECF No. 154-26, at ¶ 5.[12] Cf. Blair v. Defender Servs., 386 F.3d 623, 630 (4th Cir. 2004) (holding genuine issue of material fact exists as to whether employer was liable for negligent hiring where employer was contractually obligated to conduct background check of employees but failed to do so). In short, there is no basis for imputing knowledge of any dangerous propensities of Joshua Linkous at the outset of his employment or any time prior to C.Q.'s complaint in July, 2014. As such, Count IV fails as a matter of law.

## VI.

For these reasons, defendant BAE's motion for summary judgment will be granted and it will be dismissed as a party defendant in this case.

---

[12] In fact, BAE must recertify with the ATF every three years, and all employees are required to fill out a new application and go through another ATF background check. M. Linkous Decl., ECF No. 154-26, at ¶ 5.

An appropriate Order will be entered.

Entered: 12/01/2017

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge